UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>JEAN MANUEL RIVERA,<br><br>    Defendant. | Case No. 13-20775<br>Honorable Laurie J. Michelson |

**OPINION AND ORDER ON DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. § 3582 [38]**

Defendant Jean Manuel Rivera pleaded guilty to drug, gun, and theft offenses. He is presently serving his 135-month prison sentence at the Coleman Federal Correctional Institution in Sumterville, Florida. Having served a little over seven years, Rivera seeks to end his incarceration and obtain compassionate release under 18 U.S.C. § 3582(c)(1)(A) as a result of the ongoing coronavirus pandemic. Rivera contends that he is more vulnerable to contracting, or having a severe reaction to, COVID-19 as a result of underlying health conditions, including hypertension, obesity, and sleep apnea. And, like most of Florida, FCI Coleman Medium has recently experienced a significant outbreak of the coronavirus, which has resulted in two inmate deaths. After considering Rivera's health issues, the dangerous conditions at his prison facility, the amount of time he has served, and the factors in 18 U.S.C. § 3553(a), the motion will be GRANTED.

**I.**

According to the factual basis of Rivera's guilty plea, between December 10, 2012, and February 23, 2013, Rivera possessed and sold approximately 60 grams of heroin to an undercover

agent during multiple transactions. (ECF No. 16, PageID.74.) During one of the transactions, Rivera was armed and during another, he also sold a firearm. (*Id.*) On February 28, 2013, agents executed a search warrant at Rivera's residence and recovered over $2,000.00 in pre-recorded law enforcement funds, eight grams of heroin, heroin processing and packaging materials or equipment, a loaded Glock .40 caliber pistol, a bolt action rifle, a ballistic (bullet-proof) vest, and several rounds of live ammunition. (*Id.*) Rivera admitted his history of narcotics trafficking, sale of firearms, and ownership of the firearms. (*Id.*) He also volunteered to assist law enforcement in completing a 50-gram heroin purchase from a confirmed drug trafficker. (*Id.*) Rivera was provided with $4,000.00 in pre-recorded U.S. currency. (*Id.*) But rather than engage in the transaction, Rivera stole the money and provided law enforcement with fake heroin. (ECF No. 16, PageID.74–75.)

As a result of his conduct, Rivera was charged with possession with intent to distribute heroin, possession of a firearm in furtherance of a drug-trafficking crime (18 U.S.C. § 924(c)), felon in possession of a firearm, and theft of government money, property, or records. (ECF No. 8.) He was detained on July 11, 2013. In time, he pleaded guilty to all four counts. (ECF No. 16.) On July 7, 2014, Rivera was sentenced by now-retired District Judge Gerald E. Rosen to 135 months' (11.25 years') imprisonment. (ECF No. 20.) Rivera has a release date of April 12, 2023. (ECF No. 48, PageID.349.) Thus, considering good time credits, he has served a significant portion of his sentence.

Rivera, who is almost 40 years old and is currently incarcerated at FCI Coleman, is now seeking a sentence reduction under 18 U.S.C. § 3582. He is worried about being infected with the highly contagious coronavirus. The virus causes a respiratory disease that can result in serious illness or death. In denying Rivera's request for compassionate release, the prison warden

acknowledged that Rivera's medical documentation indicates he suffers from "varicose veins of the lower extremities, obesity, hyperlipidemia, sleep apnea, hypertension, chronic embolism and thrombosis, and long term use of anticoagulants." (ECF No. 43-3, PageID.220.) The Centers for Disease Control and Prevention (CDC) have identified persons with certain medical conditions, regardless of age, as being at increased risk for severe illness from COVID-19, including those with obesity, defined as having a BMI of 30 or higher. *See People of Any Age with Underlying Medical Conditions*, Centers for Disease Control and Prevention, https://perma.cc/7BQG-Z2R3. And hypertension may also increase the risk for serious illness from COVID-19. *Id*.

The CDC has also issued guidance acknowledging that detention facilities "present . . . unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors." *See Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Centers for Disease Control and Prevention, https://perma.cc/W3JW-4UQX20. These include "low capacity for patient volume, insufficient quarantine space, insufficient on-site medical staff, highly congregational environments, inability of most patients to leave the facility, and limited ability of incarcerated/detained persons to exercise effective disease prevention measures (e.g., social distancing and frequent handwashing)." *United States v. Kennedy*, No. 18-20315, 2020 WL 1493481, at *2 (E.D. Mich. Mar. 27, 2020). As the Sixth Circuit has summarized, the "COVID-19 virus is extremely contagious and conditions favor its more rapid transition in detention or correctional facilities." *United States v. You*, No. 20-5390, 2020 U.S. App. LEXIS 12991, at *3 (6th Cir. Apr. 22, 2020) (order).

According to Rivera, "the manner in which COVID-19 has rendered BOP facilities unsafe, combined with [his] serious, preexisting health conditions warrant compassionate release." (ECF

No. 43, PageID.199.) Consistent with the information on the BOP website, counsel confirmed at the hearing that there are 64 inmates and 32 staff members currently diagnosed with COVID-19 at FCI Coleman Medium. Two inmates have died and 130 have recovered. At FCI Coleman Minimum, which is believed to share staff with FCI Coleman Medium, another 147 inmates and 20 staff are positive and 1 inmate has died. *See COVID-19*, Bureau of Prisons, https://perma.cc/9Q7Z-PVE7.

The government acknowledges the safety risks to inmates. But they focus on the substantial measures being implemented by the BOP to minimize the virus's spread in its facilities and the strides that have been made over time. The government's primary argument, however, is that Rivera's offense and criminal history category VI status make him a danger to the community and preclude his release under an analysis of the § 3553(a) factors. (ECF No. 48, PageID.346, 360–364.)

## II.

"[O]nce a court has imposed a sentence, it does not have the authority to change or modify that sentence unless such authority is expressly granted by statute." *United States v. Thompson*, 714 F.3d 946, 948 (6th Cir. 2013) (quoting *United States v. Curry*, 606 F.3d 323, 326 (6th Cir. 2010)). As amended by the First Step Act, and upon exhaustion of administrative remedies or the lapse of 30 days from the receipt by the warden of a request for compassionate release, 18 U.S.C. § 3852(c)(1)(A)(i) allows a court to reduce an inmate's sentence if the court finds that (1) "extraordinary and compelling reasons" warrant a reduction, (2) the reduction would be "consistent with any applicable policy statements issued by the Sentencing Commission," and (3) the applicable sentencing factors under § 3553(a) warrant a reduction.

**A.**

The statutory exhaustion requirement is mandatory. *See United States v. Alam*, 960 F.3d 831, 832 (6th Cir. 2020). Rivera submitted two requests to the warden for compassionate release; one on May 19, 2020 and the other on July 3, 2020. (ECF No. 43 at PageID.201.) Both requests were denied. (ECF No. 43-3 and ECF No. 43-4.) There is no dispute that Rivera has adequately exhausted his administrative remedies.

**B.**

Having cleared the exhaustion hurdle, Rivera must demonstrate "extraordinary and compelling reasons" to justify his early release.

Congress has not further defined "extraordinary and compelling." But the commentary to U.S.S.G. § 1B1.13, adopted before the enactment of the First Step Act, does. Application Note 1 identifies the following "extraordinary and compelling" circumstances: (A) terminal illness diagnoses or serious medical, physical, or mental impairments from which a defendant is unlikely to recover, and which "substantially diminish" the defendant's capacity for self-care in prison; (B) aging-related health decline where a defendant is over 65 years old and has served at least 10 years or 75 percent of his sentence; or (C) family-related circumstances. U.S.S.G. § 1B1.13 cmt. n.1(A)-(C). Then there is a catch-all in section (D), titled "Other Reasons." That section provides that "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 cmt. n.1(D).

District courts across the country have grappled with whether they can find extraordinary and compelling reasons for compassionate release under subdivision (D) given the prefatory language that suggests the issue is to be determined by the "Director of the Bureau of Prisons."

But as another court in this Circuit has explained, the dependence on the BOP to determine the existence of an extraordinary and compelling reason, like the requirement for a motion by the BOP Director, "is a relic of the prior procedure that is inconsistent with the amendments implemented by the First Step Act." *United States v. Young*, No. 00-cr-00002, 2020 U.S. Dist. LEXIS 37395, at *15 (M.D. Tenn. Mar. 4, 2020). And "[a]lthough it does not appear that any federal circuit court of appeals has addressed this issue, a majority of the district courts that have considered the issue have likewise held, based on the First Step Act, that they have the authority to reduce a prisoner's sentence upon the court's independent finding of extraordinary or compelling reasons." *Id*. at *16.

Courts have found that the novel coronavirus combined with other factors can satisfy the catch-all provision. *See, e.g., United States v. Oliver*, No. 17-CR-20489, 2020 WL 2768852, at *6 (E.D. Mich. May 28, 2020); *Loyd v. United States*, No. 15-CR-20394-1, 2020 WL 2572275, at *2 (E.D. Mich. May 21, 2020); *United States v. Amarrah*, No. 17-CR-20464, 2020 WL 2220008, at *6 (E.D. Mich. May 7, 2020). As another court in this District explained, "[t]he common features of the few recent cases where inmates have been granted judicial relief on motions for compassionate release due to the pandemic properly exhausted claims that unreasonably were refused despite the existence of severe, chronic, or terminal conditions that would warrant release even in the absence of a pandemic" or "the defendants had severe medical conditions which placed them at high risk, were housed at a facility with confirmed cases, and had served a large majority of their sentences." *United States v. Nazzal*, No. 10-20392, 2020 WL 3077948, at *3 (E.D. Mich. June 10, 2020).

Speculative concern about catching COVID is not enough. *See United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate

6

release."); *United States v. Peaks*, No. 16-20460, 2020 WL 2214231, at *2 (E.D. Mich. May 7, 2020) (providing that a "generalized risk of contracting COVID-19 and potentially developing the more severe symptoms is not akin to the type of 'extraordinary and compelling reasons' justifying compassionate release identified by the Sentencing Commission"); *United States v. Smoot*, No. 2:19-CR-20, 2020 U.S. Dist. LEXIS 55382, 2020 WL 1501810, at *3 (S.D. Ohio Mar. 30, 2020) ("The mere possibility of an outbreak at his facility does not equate to a compelling enough reason to justify [the defendant's] release.").

Determining whether an inmate's underlying health conditions and prison setting place him at such risk as to be deemed "extraordinary" is a fact-intensive inquiry. While Rivera will only be 40 years old in a few months, several of his underlying health conditions are identified by the CDC as placing him at increased risk of severe illness from COVID-19. "Standing 6'2" and weighing 320 pounds, Mr. Rivera has a body mass index (BMI) of 41.1." (ECF No. 43, PageID.210.) This is well above the BMI level of 30 on the CDC's list of risk factors. Rivera also has hypertension, another CDC risk factor. He also has hyperlipidemia, sleep apnea for which he uses a CPAP machine, chronic embolism and thrombosis, long term use of anticoagulants to prevent blood clots, and pulpitis and periodontitis. (*Id*.; ECF No. 43-3.) At the same time, he is housed in a facility that, despite the BOP's significant efforts to try to manage the virus in its facilities (ECF No. 48, PageID.349–351), has a significant number of inmates and employees infected with coronavirus, and at least two who have died (ECF No. 48, PageID.351). Rounding out the *Nazzal* factors, Rivera, detained since July 2013 and scheduled to be released in April 2023, has "served a large majority" of his 135-month sentence. Ample case law supports a finding that Rivera's situation is extraordinary and compelling. *See, e.g.*, *United States v. Readus*, No. 16-20827-1, 2020 WL 2572280 (E.D. Mich. May 21, 2020) (granting compassionate release to defendant with severe

7

obesity, obstructive sleep apnea, hypertension, and prediabetes); *United States v. Delgado*, No. 18-cr-17, 2020 U.S. Dist. LEXIS 84469, at *10–11 (D. Conn. Apr. 30, 2020) (granting compassionate release to inmate with obesity and sleep apnea "because those conditions place [inmates] at high risk for serious complications due to COVID-19); *United States v. Scparta*, No. 18-cr-578, 2020 U.S. Dist. LEXIS 68935, at *4–5 (S.D.N.Y. Apr. 20, 2020) (granting motion for compassionate release to 55-year old inmate sentenced to 18-months who was suffering from high blood pressure, high cholesterol, sleep apnea, and hypertension in a prison facility with a significant COVID-19 outbreak); *United States v. O'Neil*, No. 11-CR-00017, 2020 U.S. Dist. LEXIS 96540 (S.D. Iowa June 2, 2020) (granting compassionate release to prisoner who had served 73 percent of his sentence and who suffered from asthma and used inhalers and a CPAP machine to assist with breathing where court was concerned "that Defendant's preexisting medical conditions create an untenable risk of death should Defendant contract a lethal, easily spread virus for which 'there is no known cure, no effective treatment, and no vaccine.'"). Indeed, the government acknowledges that "Rivera's heightened risk from Covid-19 based on his obesity qualifies as an 'extraordinary and compelling reason' for release under § 1B1.13(1)(A) & cmt. n.1(A)." (ECF No. 48, PageID.359.)

So Rivera has demonstrated an extraordinary and compelling reason for compassionate release.

## C.

But that is not the end of the inquiry. The sentencing commission policy set forth in §1B1.13 also requires the Court to consider whether the defendant is "a danger to the safety of any other person or to the community" as well as the applicable factors set forth in 18 U.S.C. § 3553(a). It is this analysis, says the government, that precludes Rivera's request.

And the government provides a compelling argument. The underlying offense involved the sale of significant quantities of drugs and guns. It is serious and dangerous. At a young age, Rivera has amassed enough criminal history points to be placed in the highest criminal-history category. And this criminal history includes prior drug and theft offenses and probation violations. (ECF No. 48, PageID.348.) His misbehavior also continued in prison, with a number of misconduct violations, including fighting. As a result, BOP classifies him as a high risk for recidivism. (ECF No. 48-1.)

Rivera paints a different picture. The seriousness of his offense is reflected in the 135-month sentence for which he has served 85 months (about 63% of his sentence). He also confessed and accepted responsibility. (ECF No. 38, PageID.181.) He describes his criminal history as "stale in nature, with most of his prior convictions occurring in his early twenties." (ECF No. 43, PageID.211.) It is true that the majority of his convictions are at least 15 years old, with a more recent larceny offense in 2010 and possession of marijuana in 2011. Most important, he says, are the "significant steps [he has taken] to reform and better himself so that he may be a productive citizen upon his release." (ECF No. 43, PageID.212.) As confirmed by counsel at the hearing, Rivera's BOP records reveal that he has over 700 hours of educational and vocational training. He has taken numerous courses involving drug abuse, fatherhood, personal finance, and HVAC and electricity training. He earned his GED in 2016. He says he has worked as a barber for the last four-and-a-half years. Rivera also describes a strong support system that includes his mother, children, girlfriend and friends. (ECF No. 38, PageID.188.) Indeed, prior to the hearing, the Court received messages from Rivera's mother and sister confirming their support. If released, Rivera plans to live and work in Ocala, Florida with his mother and two daughters. Unfortunately, the

mother of Rivera's children lost her battle with cancer a few years ago and this has further motivated Rivera to change his life so he can be there for his children.

The Court understand the government's concerns. But the government does not adequately consider the fact that Rivera has now spent over seven years in jail. His criminal history is extensive, but it does not involve significant physical violence or any firearms (other than the underlying offense). And while "drug trafficking is a serious offense that, in itself, poses a danger to the community," *United States v. Stone*, 608 F.3d 939, 947 n.6 (6th Cir. 2010), this must be balanced against the significant time Rivera has already served, his concrete plans for reentry into society, and the danger posed to him by remaining incarcerated. The same is true for his prison misconducts. While concerning, when drilling down into them, they include possession of an unknown non-hazardous tool, swinging a chair at an inmate during a fight, and possessing stolen property, which was hand sanitizer from health services.[1] So on balance, the Court does not believe that Rivera's level of dangerousness precludes his release.

This has also been the longest period of time Rivera has spent in jail. Considering his history and characteristics and the nature and circumstances of the underlying offense, the Court believes that the 85 months Rivera has spent in prison, combined with a period of supervised release that includes home confinement, is sufficient to promote respect for the law, protect the public from future crimes of the defendant, and provide just punishment and deterrence. Especially considering the efforts Rivera has made toward rehabilitation, the Court finds that the risks to Rivera's health outweigh any additional benefits he would receive from serving out the remaining 35 percent of his sentence.

---

[1] Rivera's disciplinary records were reviewed by the Court's probation department and neither party disputed the contents.

10

### III.

Thus, for the reasons stated, Rivera's motion for compassionate release (ECF No. 38) is GRANTED. His sentence will be reduced to time served and he is to be released from BOP custody immediately.

IT IS FURTHER ORDERED that, upon his release from custody, Rivera is to quarantine at home for 14 days. Rivera will also begin his 3-year term of supervised release, as outlined by the July 10, 2014 Judgment. (ECF No. 20.) For the first 6 months, Rivera shall participate in the Location Monitoring Program, utilizing technology as directed by the probation officer, and abide by all requirements of the program. The Defendant is restricted to his residence at all times, except for employment; education; religious services; substance abuse or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities as preapproved by the probation officer (Home Detention). The Court waives the fees of the program.

If Rivera is in full compliance with the conditions of supervised release, the probation officer, after 90 days, may discontinue this condition of home confinement.

IT IS SO ORDERED.

Dated: August 31, 2020

                                                      s/Laurie J. Michelson  
                                                     LAURIE J. MICHELSON  
                                                     UNITED STATES DISTRICT JUDGE